HORACE H. ADAMS, PLAINTIFF IN ERROR, *v.* THE PEOPLE OF THE STATE OF NEW YORK, DEFENDANTS IN ERROR.

*Conspiracy — means employed may be lawful — 2 R. S., 692 — Declarations of conspirators — Intimate relations between witness and conspirator — Threatening letters — acts in apparent execution of — Character — evidence as to, when prisoner makes himself a witness.*

In the trial of an indictment under the provisions of 2 Revised Statutes, 692, declaring it a misdemeanor for two or more persons to conspire to cheat and defraud any person of any property by any means, which, if executed would amount to a cheat, or to obtaining money or property by false pretenses, it is not necessary that they should be successful, nor that the means employed, so far as attempted, should be unlawful. It is sufficient if such means are part and parcel of those adopted by the conspirators and necessary to the final success of the fraud designed.

Where two or more persons confederate together to accomplish an illegal purpose, the acts and declarations of either in regard to the common design are admissible against all. In such a case it is competent to show that the relations existing between the witness and the accused were of an intimate and confidential character, as tending, in some slight degree, to sustain the assertions of the witness.

Threatening letters written by the accused to the witness to prevent him from testifying in the case are admissible as tending to show his guilt, just as an escape or an attempt to escape from prison would be.

The witness testified that after the receipt of the letters he was shot while walking in the jail yard by an unknown man who said, "see if you will tell now." *Held*, that evidence of the shooting was admissible as the jury might find that it occurred in pursuance of the threats contained in the letters.

Upon the trial the accused offered no evidence of good character to show his innocence. Having been examined as a witness in his own behalf the prosecution gave evidence to show his bad character, and he subsequently gave evidence to show it to be good. *Held*, that as the accused had not attempted

to establish his innocence by proof of good character the jury could not consider the evidence of bad character given by The People, as bearing upon the question of his guilt or innocence, but only as tending to show that he was unworthy of credit and that his testimony should not be regarded by the jury.

WRIT of error to the Court of Sessions of St. Lawrence county, to review the trial and conviction of the plaintiff in error of a misdemeanor.

The plaintiff in error was charged with having, on the 1st day of January, 1872, at the city of Ogdensburg, in said county, conspired with one Jesse B. Lamb to defraud David C. Judson, John D. Judson and Daniel Judson, of said city of Ogdensburg, of their money, goods and property.

The conspiracy alleged in the indictment was, in substance, that Lamb should deposit money to be furnished him by Adams at some bank in New York city, representing that he was one of the firm of Geo. B. Earle & Co. doing business in New York city as wool dealers; that he should take from such bank certified checks for the whole or a part of the money so deposited, payable to the order of Henry C. Carley; that with the said checks he should go to the said Judsons and represent to them that Geo. B. Earle & Co. were a firm dealing in wool and doing business in New York city; that he was their agent; that his name was Henry C. Carley, and that said firm was intending to purchase wool in Ogdensburg and vicinity.

That said Lamb (as Henry C. Carley) should get such certified checks collected by said Judsons, take the proceeds of such collected checks, or other money to be furnished by Adams, and repeat the act of depositing, taking certified checks and having them collected by said Judsons until a credit had been established with said Judsons.

Then, when there was no money in said bank in New York city and no expectation that there should be, or that checks to be drawn on said bank would be honored or paid, said Lamb was to take uncertified checks, to be drawn in the name of said Geo. B. Earle & Co. on said bank, payable to the order of said Henry C. Carley; and which uncertified checks said Lamb, under said fictitious name of Henry C. Carley, was to indorse, get discounted and paid by said Judsons before they were presented for acceptance or payment;

and the money thus fraudulently obtained from said Judsons was to be divided between said Adams and Lamb.

That said Geo. B. Earle & Co. and Henry C. Carley were fictitious names and persons, and known to be so to both Adams and Lamb.

That in pursuance of said conspiracy Lamb, on or about the 26th day of March, 1872, received from Adams $1,600, and immediately thereafter deposited it in the Manufacturers and Merchants' Bank of New York city in the name of the firm, and made to said bank the representations as per the said agreement of conspiracy.

He took therefrom a certified check purporting to be drawn by said Earle & Co. on said bank, payable to the order of said Carley, for $800; and about the same time, according to the agreement of conspiracy, presented said check to the Judsons, by whom it was collected and the proceeds taken by said Lamb as and for said Carley.

That on the 16th day of April, 1872, said Lamb presented to said Judsons, at Ogdensburg, another check purporting to be drawn by the firm on the bank, and payable to the order of said Carley, for the sum of $500, said Lamb at the time making representations to said Judsons according to said conspiracy, which check was collected by said Judsons and the proceeds delivered to said Lamb as and for said Carley.

The indictment further alleged the drawing of a check on or about the 28th day of April, 1872, by the same drawers on the same bank and payable to the order of said Carley, dated on or about April, 1873, for the sum of $500.

That there was not at the time of the drawing of the last mentioned check, and it was agreed between said Adams and Lamb that there should not be in said bank in New York city, or elsewhere, any money or value of any kind to meet, pay or take up the same.

The indictment concludes, " which said acts were all done and agreed upon by and between the said Horace H. Adams and Jesse B. Lamb, in pursuance of, according to and in aid of said conspiracy for the purpose of cheating and defrauding the said Judsons out of their money and property, against the form of the statute," etc.

Lamb was called as a witness by The People to testify as to the conspiracy. Upon the trial letters were given in evidence written, as it was claimed by the prosecution, by the accused to Lamb threatening him with death if he gave testimony upon the trial.

Lamb was also allowed to testify that while walking in the yard of the prison he was assaulted, and that by an unknown man who said as he fired the pistol, "see if you will tell now," or "you have had prior warning, see if you will tell; now tell."

After the accused had testified in his own behalf, evidence of his bad character was given by The People, and rebutting evidence in his behalf. He had not given any evidence of good character with a view to raise a presumption that he was innocent of the offense. The justice, in the course of his charge, said "the question of his character comes up in the case in two aspects and as to the probability of his telling the truth in the case; as to that you are to be careful and not to fall into error.

"When good character is shown on the part of the defendant, as may be done affirmatively, or when the party accused offers himself as a witness and the question of good character is gone into, then that matter of character is in the case, and you look at that question and see how the man as he challenges you, when he puts himself on the stand, stands as to the probability of his having committed the offense. That has very little weight in a case where there is no doubt. But when the case stands in a doubtful position and the question of character comes before the jury, then the defendant challenges investigation by the jury as though he stood up and said, 'Here I am as the evidence discloses me to be; do you believe that a man having that character would commit the offense with which I am charged?' Character is always a question for the jury, but in doubtful cases it is of the greatest significance, because it may be said that if a man by a long series of acts, by a well conducted life, has gained a good character in his neighborhood, so that when he is accused of crime he can put that character in evidence, it then becomes his shield. He has the right when he comes before the court and jury charged with an offense, he has the right to challenge investigation and say to the jury, 'Look into the evidence and see what manner of man I am, and say whether there is probability that I have done this thing.'"

Defendant's counsel excepted to that part of the charge stating that when the defendant goes on the stand as a witness then his character is a question in the case for all purposes, and requested the court to charge the jury that unless the defendant offers in the first place affirmative evidence of character the question of character, in case he is a witness, relates only to his standing and credibility as such.

The court said : "I refuse so to charge and charge, that if the question of character is legitimately gone into for any purpose it is in the case for all purposes."

Defendant's counsel excepted to the refusal to charge as requested, and also to the additional charge.

*Levi H. Brown*, for the plaintiff in error.

*J. R. Brinckerhoff*, for the defendants in error.

BOARDMAN, J. :

The plaintiff in error was convicted of a misdemeanor, and on the 16th day of February, 1874, was sentenced to the St. Lawrence county jail for one year, and fined $250. The indictment was for a conspiracy with one Lamb, to cheat and defraud the Judsons, at Ogdensburgh, of their money and property under the fifth subdivision of section 8 of 2 Revised Statutes, page 692 (714 of Edm. ed.). The statute in this respect reads as follows :

"Section 8. If two or more persons shall conspire * * * 5th. To cheat and defraud any person of any property by any means which, if executed, would amount to a cheat, or to obtaining money or property by false pretenses * * * they shall be deemed guilty of a misdemeanor."

The offense charged in the indictment, if executed, would have resulted in cheating the Judsons and obtaining their money by false pretenses. It was not necessary that the conspiracy should have been successful, nor that the means employed, so far as it was attempted, should have been unlawful. It was sufficient if such means were part and parcel of those adopted by the conspirators and necessary to final success in the fraud designed. (3 Whar. Cr. Law, §§ 2353, 2337, 2300, etc. ; *Lambert* v. *People*, 9 Cow., 578.)

The acts done in pursuance of the agreement and to accomplish the object intended thereby were overt acts, and were set up in the indictment. (2 R. S., 692, § 10 [714 Edm. ed.] ; *People* v. *Chase*, 16 Barb., 495.)

The objections of the plaintiff in error taken to the form or sufficiency of the indictment, were therefore properly overruled. That disposes of the various motions to quash the indictment, to direct a verdict for the defendant, and to arrest judgment after conviction, upon the theory that a crime was not charged in the indictment, and that a crime was not proved, when the facts stated in the indictment had been proved as alleged.

Lamb was a competent witness ; he had not been convicted of a felony (2 R. S. [Edm. ed.], 724) ; the indictment under which he was convicted was for a conspiracy ; it has none of the requisites of an indictment for forgery.

A series of objections and exceptions are taken to proof of the acts and declarations of Lamb and Adams, tending to show that they were engaged in carrying out this conspiracy. When two or more persons confederate together to accomplish an illegal purpose, the acts and declarations of either in regard to the common design are admissible against all. (1 Gr. Ev., § 111.) In this case the existence of such confederation was *prima facie* established by the testimony of Lamb, and thereafter any acts and declarations of either Lamb or Adams, in that respect, were competent against Adams. A part of The People's case consisted in showing the intimate and apparently confidential relations existing between Lamb and Adams, as tending, in some slight degree, to sustain the assertions of Lamb. For that purpose many acts and conversations between them were offered in evidence and received. We see no objection to such evidence. The force and effect of such evidence is to be judged of by the jury. It is not deemed necessary to give a separate examination to the numerous exceptions taken.

The letters claimed to have been written by Adams to Lamb were properly admissible. The evidence tended to show that Adams wrote them. Enough evidence in that respect was given to submit the fact to the jury for its decision. If the jury from the whole evidence believed the letters to have been written and sent to Lamb by Adams, then it was its duty to give to the letters such weight

as seemed proper. By the charge of the court it was so submitted. The evident purpose of the letters, if genuine, was to prevent Lamb from appearing as a witness against Adams. In that case it would be some evidence of Adams' guilt, just as an escape or attempt to escape from prison would be. The nature and effect of such evidence, and the duty of the jury in relation thereto were properly submitted.

The evidence showing Lamb was shot in the jail yard was of the same character, and competent for the same reason. If the jury found the letters in Adams' handwriting, they might, in their discretion, find the shooting in pursuance of the threats contained in such letters, and further evidence of an attempt to destroy evidence. As it was claimed that the shooting of Lamb was untrue, and that Lamb had concocted the affair in his own interest, and as evidence against Adams, other evidence was competent to confirm the truth of Lamb's testimony upon that subject. (1 Whart. Cr. Law, §§ 725, 726, 727.)

I have thus noticed a small number of the exceptions taken upon the trial. The case contains over 3,000 folios. The exceptions are very numerous; I am not prepared to say that none of them are well founded, but I do believe that no evidence was received improperly which could have had any appreciable effect upon the deliberations or verdict of the jury. I think the same is true of the evidence, if any, improperly rejected. If absolute accuracy must be required then it is quite possible a new trial should be had; but I suspect as many and as grave questions would be presented upon a second, a third, or a fourth trial, as are here urged. We believe we are not called upon to be astute in imagining injuries which the plaintiff in error may have been subject to, if we can see no adequate causes therefor. The charge to the jury by the learned judge was a model of fairness to the accused; every protection was thrown around him; every caution was bestowed upon the jury to guard them against an improper conviction. Under such circumstances a conviction should not be lightly interfered with, unless the court can see some indication that the accused has or may have suffered some wrong at the hands of the court or jury in the progress of the trial.

A final exception remains to be noticed. The plaintiff in error

was examined as a witness in his own behalf. He did not, in answer to the case made by the prosecution, offer any evidence of his good character, as a circumstance favorable to his innocence. After the plaintiff in error rested, the prosecution, without objection, gave evidence tending to show his character was bad. After The People had again rested, the plaintiff in error also gave evidence, without objection, tending to show his character good. At the close of the judge's charge he was requested by the counsel for the accused to charge the jury " that unless the defendant offers in the first place affirmative evidence of character, the question of character, in case he is a witness, relates only to his standing and credibility as such." The judge replied : " I refuse so to charge, and charge that if the question of character is legitimately gone into for any purpose it is in the case for all purposes ;" to which exception was taken both as to the refusal, and also the additional charge given. The charge, as made by the learned judge (fols. 2937 to 2941), corresponds with the ruling upon such request. Did the court err in such decision ?

Counsel have failed to present us with any authority upon the precise question, and none upon a careful investigation has been found. In fact such a question could not have arisen prior to 1869 when, for the first time, prisoners were allowed to become witnesses in their own behalf. Before 1869 the prosecution could not give evidence of the prisoner's bad character unless the prisoner had first offered evidence of his good character. When evidence was so given, it was for the purpose of creating a presumption of guilt or innocence, to be inferred by the jury, from the character proved. It presents the question whether a person of the character proved would, or would not, be guilty of the crime charged against him ; and the character of the prisoner may be so good as seriously to affect the credibility or accuracy of the evidence offered against him. Such evidence was, therefore, competent to raise a presumption of innocence, and to attack and impeach the evidence of The People.

The statute allowing persons accused of crime to be witnesses in their own behalf (2 Laws of 1869, chap. 678, p. 1597), did not change or affect such rule. By that act the accused might become a witness. If he did not, no presumption arose against him. But if he became

a witness, the truth of the evidence became a legitimate subject of inquiry. Its reliability might be attacked upon his cross-examination as to his character as shown by his past life and conduct, or by introduction of witnesses to contradict any material evidence given by him. Beside these modes, the value of his testimony may be impeached by evidence of witnesses affecting his credit for veracity by reason of his general reputation. In respect to the evidence given by the accused, he may be treated as any other witness. Such was the course taken on this trial. The accused did not seek to give evidence of his good character with the purpose of raising a presumption of his innocence of the crime charged. His failure to do so raised no presumption against him. (*Ormsby* v. *People*, 53 N. Y., 472.) But he was sworn as a witness. His character then became a proper subject of inquiry. Not by his own act and in favor of his innocence, but by the act of The People in favor of his guilt, by attempting to show that, as a witness, he was unworthy of credit, and his testimony unworthy of consideration by the jury. That was as far as The People had a right to go. But the court by its charge allowed this evidence for all purposes. Hence the accused was justified, and the court had so charged, in asking the jury to acquit upon the presumption of innocence arising from his character as proved. The charge, so far as it allowed such a conclusion by the jury, may have been improper, but it was in the interest of the accused. It gave him a chance of acquittal not, perhaps, due on the law and the facts. The evidence was capable of being used for but two purposes : first by way of discrediting the testimony of the accused, and secondly as a foundation for the presumption of innocence of the crime charged. No doubt the first purpose was proper. If the second purpose was improper, the charge gave the accused the benefit of it. The jurors were permitted to say by their verdict : " From the character of the accused as proved before us, we do not believe he was guilty of the crime charged against him. We have more confidence in the good character shown as presumptive evidence of his innocence than we have in the questionable evidence of an accomplice poorly, if at all, corroborated as to any material fact."

This is what the court by its charge permitted the jury to do. The jurors were not instructed that they could convict the accused

because his character was bad. No such thought could have been entertained. The expression "for all purposes" meant only such purposes as, under the rules of criminal law, were permissible irrespective of the order of proof. The charge (fols. 2937 to 2941), confirms this construction, and shows that the accused was benefited and not hurt thereby. It gave the accused a chance for escape which the strict rules of law might not have permitted. Hence we think, in this respect, no error exists to the prejudice of the plaintiff in error.

Upon the whole case, the judgment and conviction should be affirmed.

Present — LEARNED, P. J., BOARDMAN and BOCKES, JJ.

Conviction and judgment affirmed.